The last case for oral argument this morning is Dine Citizens v. Bernhardt. Good morning, may it please the court. My name is Samantha Russ Gabbage-Barrs and I'm joined at council table by co-counsel Kyle Tisdale and I'd like to reserve five minutes for rebuttal. You'll just watch your own time. Thank you. This case is about the cumulative impacts of a game-changing oil and gas boom in the Mancos Shale Formation in northwest New Mexico that surpasses in both magnitude and scope all levels of development that were sometimes failure to acknowledge and account for the cumulative impacts to cultural resources, the communities, and the environment from the development of an additional 3,960 Mancos Shale wells using horizontal drilling and multi-stage hydraulic fracturing is really at the heart of the claims in this case. And those are those wells not yet drilled? Those are potential wells? Some of those wells may have been drilled, your honor. The actual wells that we know are at issue here, what number are we dealing with? In our briefs we have used 362 wells and I know BLM may have a different number because of what's happened to those wells and their approval. So the 3,000 number is the number we get from a report that said there's a potential for this number in the future. Yes, your honor. The 2014 reasonably foreseeable development scenario estimated that Mancos Shale could support the drilling of those 3,900 wells using this new technology. So today I'll be addressing two things. And first is that BLM violated the National Historic Preservation Act because it failed to consider the cumulative air, noise, and light pollution from development of nearly 4,000 new Mancos Shale wells and whether it would adversely affect the historic setting of landscape level cultural sites that are within and adjacent to the Mancos Shale formation where all this development will occur. And then second, BLM violated NEPA because the agency approved the Mancos Shale drilling permits without knowing the true extent of the cumulative impacts of developing all of these new wells. Well, before you do that, I'm struggling with the question of standing here. I don't see how there's standing in this case or I'm struggling with the question. In light of Lujan versus National Wildlife Federation, why didn't you have to establish standing as it relates to every APD as opposed to making a collective argument that there's been harm suffered by the clients in this case? Yes, Your Honor. For NEPA cases, what the plaintiffs have to demonstrate is that there is an increased risk of environmental harm from the agency's failure to follow statutory procedures. And that relates to a specific agency decision and the specific decisions here are permitting decisions. Yes, Your Honor. And for those of you who are not familiar with NEPA, NEPA is the National Wildlife Federation. NEPA is the agency that has to consider the cumulative impacts of this drilling, of these 362 wells. And have you addressed any individual well, any individual decision in assessing the harm that supposedly is caused by the action of the agency? Yes, Your Honor, because all of these wells are part of this ongoing development. And in all of the standing declarations, the agency has stated that there is increased harm from ongoing drilling and that the addition of 362 additional wells is going to increase the risk of environmental harm to them from these actions. Now, did they in their declarations draw a nexus between their harm and any particular permitting decision? Yes, Your Honor. In the declarations, one of the declarations has a map. The declaration of Jeremy Nichols shows where these wells are. And in the other declarations, the declarants discussed their use of the landscape. Some of these folks recreate there. Some of these folks, a few of these folks actually live out there. Well, the latter really doesn't seem to go to the question that I'm asking. The question I'm asking relates to a specific permitting decision and tracing your harm to that permitting decision. And in the case of Mr. Nichols, the fact that you have a map doesn't mean that you necessarily have been in a situation where you have experienced any particular harm associated with that particular permitting decision. And so that's what I'm trying to get at. Your Honor, this... Explain to me, if you think there is law that doesn't require that, I want to know specifically what is your best case to tell me that what I'm saying to you is off-base and that this sort of standing analysis is not required. Yes, Your Honor. And in fact, this court in Southern Utah Wilderness Alliance v. Palma, which was a leasing case where the district court had determined that the... That Suwa had lacked standing because their declarant did not claim that he had traversed over the specific parcels of land that were for sale in the lease. And what this court had said is that it is not about traversing every piece of land for a lease. It is about using the area that will be affected by those agency decisions. And so in that case, the declarant would be able to... He used lands that were in the vicinity of where these leases would be and he would be harmed by that lease development. Wasn't Palma resolved on rightness and not standing grounds? Ultimately, the court actually said that the district court had misapplied the injury in fact law and found that Suwa had standing. Did it resolve the matter on rightness grounds? I don't recall. And there was one other case that specifically dealt with oil and gas, standing in the oil and gas context, and that was New Mexico v. Richardson, and that was concerned about oil and gas development on Otero Mesa. And during the planning stages, all of the declarants had identified that they used parts of Otero Mesa that could be affected by oil and gas development in the future. What was the nature of the agency decision that was being challenged there? That was an EIS for a resource management plan. And that EIS would cover all of that area? Yes. So that is a different thing than an agency decision that is based upon a permitting decision. Those are two discrete acts. It is different, Your Honor. And as we get from the resource management plan stage to the Suwa v. Palma case, which talked about leasing, we can see that there has to be a geographic nexus with what is the affected area. And I'm not aware of any cases that deal specifically with standing in the drilling permit context, but it is still what is really key to standing is a geographic nexus to the affected area. And that's similar to what this court said in Committee to Save the Rio Hondo v. Lucero, where the agency action was occurring 15 miles upstream. But the standing declarants were talking about injury that would occur to them because of their nexus to the stream. And the agency action was what? The agency action there was approval of a ski area 15 miles away. 15 miles away that would affect them? Yes. And so they identified that specific agency action and the harm that they would suffer from that specific agency action? Yes. Okay. Well, what I'm saying here is that if the record does not reveal that you identified a specific agency action and the harm directly drawn from that specific agency action, and here we're talking about these willed wells that have been drilled, the 337, then I'm trying to figure out why that's not a standing problem. It's not a standing problem, Your Honor, because we're alleging that BLM's failure to consider the cumulative impacts of development is really the source of our claim. And what the injury that we discussed... You know, well number one, 337. You know what? BLM didn't consider the cumulative effects when they decided to permit that well. Well two, they didn't consider the cumulative effects when they decided to permit that well. Why couldn't you do that? Well, what we say in the declarations is that the harm stems from all of these wells. We don't identify them on a well-by-well basis because... Okay, I'll let it go. Okay. So turning to the NHPA claim, BLM is required to consider the direct, indirect, and cumulative impacts of development to cultural sites. But here, with respect to all of these drilling permits, BLM limited its analysis for the area of potential effect, or APE, just to the construction footprint for each individual well path so that it only captured direct impacts to small archaeological sites. BLM has to establish an APE broad enough to capture all impacts. Now direct impacts like site damage and destruction that BLM focused on are only part of what the NHPA requires. Even if a cultural site is not threatened by a bulldozer, it can be indirectly and cumulatively affected by the aggregate effects of this rapidly expanding development. The historic significance of a cultural site isn't just limited to its data potential as an archaeological site. For places like Chaco Canyon National Park, the Chaco Protection Sites designated by Congress and Chaco and Outliers, and the prehistoric roads that connect them, part of their historical significance is found in their setting, feeling, and association. What does the 2014 protocol have to do with this determination? The 2014 protocol provides guidance to BLM as to what to do when sites whose setting is an important aspect of their historical significance might be affected by development and might be affected particularly by agency actions that are occurring later in time or at a greater distance away. And so what that requires is that the agency consult with the SHPO to really determine what is the size of the analysis area or APE we should be looking at to figure out if air, noise, and light pollution from these wells is going to damage a site's historic integrity. I was just going to say, hasn't that already been done before they issued the APE? No, Your Honor. BLM did not consult with the SHPO over indirect or cumulative effects. What BLM consulted with the SHPO over was whether there were any archaeological sites within what's called the standard APE, which is the well pad, the access road. And there are examples of those cultural resource reports cited in our brief. BLM went out, sent an archaeologist out there to do pedestrian survey,  and come up, if there were, come up with a mitigation strategy, which is usually just avoidance of that particular site. And the SHPO concurred with those decisions. That's direct impacts. We do not challenge BLM's analysis of direct impacts to archaeological sites from well pads. But what we're saying is when you are projecting that an area that was not previously subject to extensive development is going to be developed, already issued 362 drilling permits, that there has to, that the BLM at this stage has to consult with the SHPO over how to make sure there's no indirect impacts. Where do we find that requirement? Well, the requirement... For them to move beyond the standard APE analysis. Well, it first comes from the NHPA's requirement, the Section 106 regulations requirements, that the agency analyze not just direct impacts, but indirect and cumulative effects. At 36 CFR 800.4. So you're saying there needs to be two separate analyses, that is direct, you do that one, and then you do yet another one that's freestanding that talks about indirect effects? Yes, if it hasn't already been done, and it has not. I thought when they did the direct effects, part of that analysis was broader than just the footprint. The record shows that in some cases where there was, I believe it's like a nine acre area, they did pedestrian survey of a 16 acre area. There are several examples of that. Right. So they are moving a couple hundred feet out. But when you're talking about air noise and visual impacts, you are not talking about a surface impact. You're not talking about a bulldozer going through one of those chaco and outlier sites. What you're talking about is that the cumulative air pollution coming off of this development could compromise the historic setting of these larger properties. Didn't they find in doing the 2014 protocol that there were not any historic properties within the APEs that were defined at the time? They found that there were no larger landscape level historic properties within the small APEs for each individual well pad. They didn't take that next step. And knowing what was out there, that's what's really key in this case and distinguishes it from a case where the agency doesn't already know that there are hundreds of large archaeological sites, landscape level sites like Chaco Park that are out there on the landscape. BLM details these in its 2003 RMP. It lists them. It knows at least where these big sites are. And that is really the trigger for BLM to consult with the SHPO to try to figure out what kind of an analysis area do we need to look at to make sure we encompass these effects. And that's what the agency did. The 2014 protocol just merely says, I think, that a broader view, a separate indirect effect analysis may be pursued. It's not a requirement, is it? Your Honor, it's not a requirement imposed by the protocol. The protocol sets out the process the agency goes to when it needs to define a broader analysis area to capture indirect and cumulative effects. The regulations require that BLM analyze these impacts. And here, with everything BLM knows about what's out there on the landscape, it was arbitrary for the agency to just confine its analysis to individual well packs. When you say regulations require, could you pin that down a little bit? 36 CFR 800.5 requires assessing adverse effects. Thank you. Good morning. May it please the Court, Avi Kupfer for the federal appellees. With me at counsel's table is Dessa Reimer, who represents the intervenors, and will be taking five minutes to argue. Although it's understandable that plaintiffs value the entire landscape of the San Juan Basin as a whole, that is not a basis for bringing an APA challenge to particular site-specific drill permits. These plaintiffs challenged the broad resource management plan for the San Juan Basin, the 20-year planning document governing all action on public lands in this 8 million acre area, and they lost that challenge. This case is about 350 specific permits issued pursuant to that management plan, and rather than allege any particularized deficiency in any of the site-specific analysis conducted for these permits, or alleging any connection in their standing declarations to any of the area around these permits, plaintiffs paint with the same broad brush that they did in challenging the resource management plan. In their declarations, did you perceive any sort of connection in one of these eight decisions about permit drilling where they would allege any particular harm associated with that decision? No, Your Honor. The Nichols Declaration that my colleague just mentioned, that discusses past visits to these sites and alleges an enjoyment of the, quote, greater Chaco region. And under this court's decision in New Mexico, X. Roe Richardson, that would be sufficient if what was being challenged was a resource management plan. But now they're challenging 350 specific drill permits, and the case that's on point here is the Supreme Court's case in Summers v. Earth Island Institute, where it said that there has to be some relationship to the particular agency action being challenged. That was a timber sale where the plaintiff had alleged a connection to the broader national forest where the timber sale was occurring. None of their standing declarations discuss any connection to future activities that they're planning in the vicinity of these specific permits, and there was no reason that they couldn't have done so. Pursuant to a consent decree in an unrelated case, BLM had to invite these plaintiffs on site visits to these drilling permits, and that would have provided more than a sufficient opportunitor for these plaintiffs to determine whether or not they had some connection to this area on which to base any allegation of particularized future concrete harm. None of the cases that plaintiffs mentioned are on point here. The Palma case was regarding the pleading stage of litigation, and the plaintiffs there discussed future plans to visit the parcels at issue as often as possible. As I mentioned, the New Mexico Elks Rail Richardson case would be applicable if this was a challenge to a management plan, but that's not this case. Was I wrong? Was Palma a rightness case? I believe so, Your Honor. It did speak about standing. It did speak about standing. The key point of distinction from that case is, again, in their declarations, in their standing declarations, the plaintiffs in that case did allege a future plan to visit as often as possible the particular parcels where the oil and gas development was occurring. Well, don't you have that here? I mean, you have the development in a very close shot, if you want to talk about shotgun shooting, a close shot gathering of the wells, and if they're in this area visiting even to go to the parc itself, you're very close to this large gathering of wells, existing wells. The parc itself is about eight miles away from the nearest drill site, so it's not in the immediate vicinity, and the harms that plaintiffs' standing declarations allege in connection with their visits to those sites are highly attenuated. They talk about impacts to the setting and the visibility where all of the evidence in the record demonstrates that none of these drill permits are viewable from that site, including... When you say viewable, you mean the pad themselves, rather than any flames that would shoot up in the night sky? No, the entire operation is not viewable, including during the night sky, to the archaeoastronomical resources of the Chaco parc. Not viewable from where they said they visited. Exactly. So at the summary judgment stage, plaintiffs need to allege more than some highly attenuated environmental harm. So they didn't do what they did in Poma in terms of saying they had a future, in the future they plan to visit, for example, a particular permit site. Not at all. They don't identify any particular site in the vicinity of any of these permits viewable from any of the historic properties. What about air? Is the air changeable and affected by where they are visiting? Again, that is a highly attenuated allegation. Every piece of evidence in the record, the specific environmental assessments that plaintiffs don't engage with in any of their arguments explain that no air pollutant will exceed the levels of the National Ambient Air Quality Standards, that there will be very small direct and indirect increases in greenhouse gases, but these emissions aren't expected to exceed any criteria pollutant. They don't engage with any of that. What about the woman that lives next to Highway 550 and has the trucks going by and the noise? That isn't connected to any of these specific drill permits that were approved here. This is a region where there are more than 18,000 active wells. This isn't a pristine wilderness. This is in the middle of a region that's highly developed, so to try to connect her experience on a highly traveled highway, in a region where there are 18,000 wells, to a particular drill permit, that particular standing declarant doesn't allege any indication of visiting. So what would a plaintiff have to do here? Go out and say, could you please tell me the drill, the well number here? Well, these plaintiffs were invited. Then I'll say, okay, I'm standing next to this well number, and the noise is unbelievable, and the flames shooting up in the night sky are impressive? If they had done what the plaintiffs did in Palma, it would have been more than sufficient. As I mentioned earlier, these plaintiffs were invited on site visits to the particular well sites in connection with a consent decree in a different case. So they had every opportunity to demonstrate some interest in the area that would be impacted by these drill permits. Okay, so let me ask that. I had sort of the same question as Briscoe in trying to see what that declaration would look like that would be sufficient. So applying it to this case, we have a map in the Nichols Declaration that was a map, and you have these particular permitted drill site places. If the person, if the declarant had said, I have been to, let's say they identify, I've been to, they're 337, I've been to, you know, 1234, and I have been in the, and by being in next to 1234, I also could experience the impact of all the rest of those 337. So I don't have to go, consistent with Palma, I don't have to go to the other, you know, the other 337 or the remaining outside of the four, but I am still impacted. Would that be sufficient? That wouldn't be sufficient. It would not. With the Supreme Court's decision in Summers, they have to allege some connection to the particular decision being challenged. Well, no, but in that situation, what they would say is they would identify all 337. They just wouldn't necessarily go, put their foot on the pad of all of those 337. It looks as if they were closely, in close proximity to each other. So they put their foot on the pad. I understand. Yes, I believe that would be sufficient. This Court's well aware of the government's standing arguments. I want to make sure I have the opportunity also to address any questions that the panel has on the merits. Plaintiffs discussed the NHPA analysis that BLM conducted, but they actually mischaracterized the thorough review that was done. For every single one of these drill pads, every single one of the permits, BLM compiled a cultural resources record review, where its archaeological and cultural resource experts looked up to a mile away from the drill site and examined whether there were any historical properties in any state register, the national historic register. But their argument goes to Kimmel to then have a new projection of what would be the drilling activity on that area. I believe that Kimmel and NHPAC's argument is in connection with the alleged NEPA violation. Well, I've heard them talking about it in connection with their historical preservation act. I believe the requirement in their historical preservation act is to analyze whether there will be a direct or indirect alteration. Indirect effects could fall into that category. Sure. Yes. Sorry, I misunderstood, Your Honor. It could fall into that category. This court gave substantial deference to the BLM in defining the applicable area of potential effects. And there is just no evidence in the record that deviating from the standard area of potential effects that BLM promulgated with the State Historic Preservation Office was arbitrary here. They don't point to any cultural resource record of review that missed any impact. They don't engage with any of the site-specific environmental assessment and cultural resource record of review analysis, all of which demonstrate that there will be no indirect impacts altering a characteristic of a historical site impacting its eligibility for listing on the historic register. With respect to the sites that plaintiffs are interested in, the Chaco Historical Park in particular, BLM did the analysis, and that analysis showed that there would be no indirect impact on air quality or on the viewshed from the park, including the night sky viewshed, that would impact its eligibility for listing on the historic register. That analysis was done. There's just simply no basis for plaintiff's supposition that applying the standard area of potential effects from the 2014 protocol, which, by the way, only applies to 129 of the challenged 350 or so permits, was arbitrary here. I see I'm cutting into my colleague's time. So thank you. And for those reasons, the discourse is dismissed for lack of jurisdiction and the alternative to firm the judgment is lower court. Thank you. May it please the court. Your Honor, it's Dessa Reimer on behalf of the intervener operators in this case, and I'll just take a couple of minutes to reinforce a couple of key points on the merits. The first is that even if the 4,000 wells that were identified in the 2014 scenario were reasonably foreseeable, which the operators do not concede that they were given that none of those have been planned or proposed at this point, at the current pace of development, which is set out by looking at the number of wells that had been drilled in 2015 when the district court first considered this case, compared to the number of wells in 2017, 85 new wells, we're looking at about 40 to 50 wells a year. So if you've got a scenario that's talking about 4,000 wells, that's going to happen potentially over the course of decades, 80 to 100 years. But if you use a 4,000 wells scenario, how does that relate to the 2003 RMP EIS? And it doesn't seem to me that that contemplated anything like that activity. The 2003 analysis looked at 9,900 and some odd wells. And by the time this case came before the district court, about 4,000 had been drilled, about 40%. There's still almost 6,000 wells that were predicted. The impacts considered in 2003 that have not yet been drilled. And so as this court said at the PI stage in this case, those impacts are fully encompassed in the 2003 analysis. And so therefore there was no requirement at that time to supplement to consider these 4,000 additional wells. It's pretty hard to argue, isn't it, with a straight face? Which argument? That increase in wells didn't change anything. Well, in this instance, there's no difference in the kind of impacts associated with mangrove shale development as opposed to traditional vertical wells. The record shows that the basin has been subject to hydraulic fracturing since the 1950s. So the difference now is that each well takes longer to drill and it drains more resource. So on a basis of well-to-well, yes, a horizontal well creates more impacts. But as the district court noted, there's a net positive effect. And these plaintiffs actually requested at the 2003 RMP stage that BLM require horizontal drilling for that reason. It means less wells on the landscape, less overall impacts. But how does that impact if the 2003 document was focused on the water usage that would be associated with vertical wells? Horizontal wells use much more water. So why wouldn't that be a consideration that was not taken into account in 2003? Well, absolutely, they do use more water per well. But when you look at the 2014 reasonably foreseeable development scenario, it talks about the water use that's going to occur with mangrove shale drilling and says that at peak use, it will not exceed the water that was being used for vertical drilling on an annual basis. So BLM does have that information. As it moves forward in the RMP review stage, the amendment that's taking place now, it will consider those impacts on the landscape scale, which is what the plaintiffs are asking for. Your Honor, as I've used my time, thank you very much. Thank you. And I think you are out of time, right? I have 45 seconds. No, it goes up. Our clock goes up after you run out of time. I know, we should stop doing that. Thank you both for your arguments, all three of you for your arguments this morning. The case is submitted. We will take a brief break and then we'll come back and visit with the students.